1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **AUTUMN ZETZ and ERIC ZETZ,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**BOSTON SCIENTIFIC CORPORATION,**<br><br>**Defendant.** | **CASE NO. 1:19-cv-00451-AWI-SAB**<br><br>**ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE EXPERT OPINIONS AND MOTION FOR SUMMARY JUDGMENT**<br><br>(Doc. Nos. 98, 99, 100, 101, 102, 103, 104) |

This product liability case stems from injuries that allegedly occurred after a pelvic mesh device was surgically implanted into Plaintiff Autumn Zetz. Ms. Zetz and Plaintiff Eric Zetz filed suit against Defendant Boston Scientific Corporation for damages in Fresno County Superior Court alleging strict liability, negligence, breach of warranty, fraud, misrepresentation, and loss of consortium. Doc. No. 1-1. The matter was removed to this Court pursuant to 28 U.S.C. §§ 1332, 1441, 1446. Doc. No. 1. Pending before the Court are Defendant's Motions to Exclude Expert Opinions and Motion for Summary Judgment. Doc. Nos. 98, 99, 100, 101, 102, 103, 104. For the reasons discussed below, the Court will grant in part and deny in part Defendant's Motions to Exclude Expert Opinions and grant in part and deny in part Defendant's Motion for Summary Judgment.

//

**FACTUAL BACKGROUND[1]**

Defendant manufactures and markets the Obtryx™ Transobturator Mid-Urethral Sling System ("Obtryx"), a prescription medical device that the Food and Drug Administration ("FDA") cleared for marketing in 2004.  JSUMF ¶¶ 1-2.  The Obtryx is a mid-urethral polypropylene mesh sling surgically implanted by a physician for treatment of stress urinary incontinence ("SUI").  JSUMF ¶ 4.  The Obtryx is accompanied by Directions for Use ("DFU"), which outline the product's indications for use, contraindications, and directions for use.  JSUMF ¶¶ 5-6.

The polypropylene resin that Defendant used to manufacture the Obtryx was a material manufactured by Phillips Sumika Polypropylene Company ("PSPC").  PUMF ¶ 1.  The Material Safety Data Sheet ("MSDS") for the polypropylene instructed "[d]o not use this [] material in medical applications involving permanent implantation in the human body or permanent contact with internal body fluids or tissues."  PUMF ¶ 2; Doc. No. 115-4 at 2.  In Defendant's contract with PSPC signed October 1, 2004, the indemnification provision "advised and cautioned [Defendant] to make its own determination and assessment of the safety and suitability of the PSPC polypropylene product for use by, for, and on behalf of [Defendant]," and stated it was the "responsibility" of Defendant "to ensure that the PSPC propylene product is suited to [Defendant's] specific application.  PUMF ¶ 4.

On November 12, 2008, Ms. Zetz underwent a surgical implant of the Obtryx pelvic mesh from Dr. Gilbert Dale in California.  DUMF ¶ 11.  At the time Ms. Zetz received the implant, the Obtryx DFU contained the following precautions:

PRECAUTIONS

- Standard surgical practices should be followed for the suburethral sling procedure as well as for the management of contaminated or infected wounds.
- The procedure should be performed with very careful attention to avoid laceration of any vessels, nerves, bladder and bowel.
- Do not remove the protective plastic sleeve covering mesh implant until proper position has been confirmed.

---

[1] "DUMF" refers to Defendant's undisputed material facts.  "PUMF" refers to Plaintiffs' undisputed material facts.  "JSUMF" refers to the parties' joint statement of undisputed material facts.  The Court has reviewed the parties' objections to various pieces of evidence/proposed facts.  To the extent the Court utilizes such evidence/proposed facts, any objections thereto are deemed overruled.  The facts analyzed in this motion are based on the portions of the record identified by the parties in their briefs.  See Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003) ("A party opposing summary judgment must direct our attention to specific, triable facts.").

- Ensure the mesh is placed without tension under the mid-urethra.
- Use of this device should be done with the understanding that subsequent infection may require removal of the mesh.
- Patients should be counselled to refrain from heavy lifting, exercise and intercourse for a minimum of four (4) weeks after the procedure. Physician should determine when it is suitable for each patient to return to normal activities.
- Should dysuria, bleeding or other problems occur, the patient should be instructed to contact the physician immediately.
- Do not use any mechanical means of contact with the mesh (such as clips, staples etc.) within the urethral support region of the mesh as mechanical damage to the mesh may occur.
- Avoid excessive tension on the mesh during handling.

JSUMF ¶ 7.

The Obtryx DFU also listed the following potential complications from use of the Obtryx:

POTENTIAL COMPLICATIONS

The following complications have been reported due to suburethral sling placement, but are not limited to:

- As with all implants, local irritation at the wound site and/or a foreign body may occur.
- Tissue responses to the implant could include vaginal extrusion, erosion through the urethra or other surrounding tissue, migration of the device from the desired location, fistula formation and inflammation. The occurrence of these responses may require removal of the entire mesh.
- Like all foreign bodies, the mesh may potentiate an existing infection.
- Excess tension may cause temporary or permanent lower urinary tract obstruction and retention.
- Known risks of surgical procedures for the treatment of incontinence include pain, infection, erosion, device migration, complete failure of the procedure resulting in incontinence and mild to moderate incontinence due to incomplete support or overactive bladder.
- In addition to the above listed potential complications, allergic reaction, abscess, detrusor instability, pelvic and vaginal pain, dysparenia, vaginal bleeding, vaginal discharge, dehiscence of vaginal incision, edema and erythema at the wound site have been reported due to suburethral sling procedure.
- It has also been reported that groin pain, orthostatic symptoms, fatigue and shortness of breath may occur due to the potential development of hematoma in the obturator foramen.

JSUMF ¶ 8.

Approximately nine years after receiving the Obtryx implant, Ms. Zetz began experiencing internal pelvic pain on her right side. DUMF ¶ 13. On May 3, 2018, Ms. Zetz had a neurogram performed at UCSF Health which indicated "abnormal hyperintense T2 hyperintensity involving the left greater than right pudendal nerves." DUMF ¶ 14; Doc. No. 115-44 at 5. Ms. Zetz thereafter consulted with Dr. Greg Vigna, who was both a lawyer and a physician, and hired him

as her lawyer.  DUMF ¶ 18.  On November 28, 2018, Ms. Zetz underwent surgery with Dr. Lisa Rogo-Gupta to remove the Obtryx sling, and on July 24, 2019, Ms. Zetz underwent another surgery with Dr. Michael Hibner to remove groin mesh.  DUMF ¶¶ 21, 28.  Despite these surgical operations, Ms. Zetz still allegedly experiences pain.

On January 30, 2019, Plaintiffs filed a Complaint against Defendant in Fresno County Superior Court alleging strict liability, negligence, breach of warranty, fraud, misrepresentation, and loss of consortium.  Doc. No. 1-1.  Defendant is a Delaware corporation with its principal place of business and corporate head office located in Massachusetts.  JSUMF ¶ 3.  On April 12, 2019, Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, 1446.  Doc. No. 1.  On April 19, 2019, Defendant filed a motion to dismiss Plaintiffs' Complaint, which the Court granted in part and denied in part.  Doc. Nos. 6, 15.  On August 9, 2019, Plaintiffs filed the operative First Amended Complaint ("FAC") for damages, including punitive damages, alleging the following four causes of action: (1) failure to warn, (2) negligence, (3) breach of express warranty, and (4) loss of consortium.  Doc. No. 16.  Defendant thereafter filed its Motion to Exclude Expert Opinions and Motion for Summary Judgment.  Doc. Nos. 98, 99, 100, 101, 102, 103, 104.

## I.   DEFENDANT'S MOTIONS TO EXCLUDE EXPERT OPINIONS

Defendant's motions look to exclude the opinions of the following experts: (1) Michael Thomas Margolis, (2) Peggy Pence, (3) Ie-Ming Shih, (4) Jimmy Mays, (5) Robert Tremp, and (6) Darryl Zengler.  The Court will review the alleged basis for exclusion for each individual expert below.

## LEGAL FRAMEWORK

The Court has a duty to act as a "gatekeeper" for expert testimony by assessing its admissibility.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 145, 147 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993); Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.").  This inquiry is governed in part by Rule 702 of the Federal Rules of Evidence, which pertains to "Testimony by Expert Witnesses" and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court set forth the following, non-exhaustive factors for reviewing the reliability of an expert opinion: (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community.  Daubert, 509 U.S. at 593-94.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and "a trial court may exclude evidence when it finds that there is simply too great an analytical gap between the data and the opinion proffered."  Domingo v. T.K., 289 F.3d 600, 607 (9th Cir. 2002) (quoting GE v. Joiner, 522 U.S. 136, 146 (1997)).  "However, expert testimony may still be reliable and admissible without peer review and publication."  Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1235 (9th Cir. 2017) (citing Clausen v. M/V New Carissa, 339 F.3d 1049, 1056 (9th Cir. 2003)).  "That is especially true when dealing with rare diseases that do not impel published studies."  Id.  Where the experts' opinions "are not the 'junk science' Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'—to 'attack shaky but admissible evidence,'"  Id.  (citing Daubert, 509 U.S. at 596).

**1.  <u>Michael Thomas Margolis</u>**

Defendant's *Daubert* motion looks to exclude Margolis's "specific causation" opinions regarding the relationship between the Obtryx and Plaintiff's injuries, Margolis's "warning"

opinions regarding the adequacy of the Obtryx DFU, Margolis's "general opinions" regarding certain topics, and any opinion regarding the knowledge, state of mind, and conduct of Defendant and third parties.  The Court will address each argument in turn below.

A.  <u>Specific Causation Opinions</u>

Margolis's expert report opines that Defendant's Obtryx sling caused or significantly contributed to Ms. Zetz's documented injuries which include: (1) vulvodynia, (2) vaginal pain, (3) groin pain, (4) interstitial cystitis, (5) dyspareunia, (6) pelvic floor myalgia (7) spastic pelvic floor syndrome, (8) right and left pudendal neuralgia, (9) right and left obturator neuralgia, (10) recurrent urinary tract infections, and (11) scarring, retraction and contraction of vagina, urethra, periurethral tissue obturator internus and obturator membrane.  Doc. No. 98-3 at 12.  Margolis's report further states that "Mrs. Zetz's injuries and complications are permanent and will require necessary and appropriate medical care to her life-expectancy."  Id.

Defendant contends that Margolis's opinions regarding Plaintiff's injuries and need for future medical care should be excluded on the following grounds: (1) the medical literature cited by Margolis do not support his theory that the Obtryx can cause pudendal neuralgia; (2) Plaintiff's treating physicians either made no causal connection between the Obtryx device and pudendal neuralgia or specifically excluded it as a potential cause; (3) Margolis failed to reject alternative causes for Plaintiff's injuries in his differential diagnosis; and (4) Margolis's opinions regarding Plaintiff's future medical treatment needs are speculative and based on inadequate facts.  In response, Plaintiffs argue that (1) Margolis's report is based not only on published literature in support of his opinions but also on his education, training, experience, and review of various materials including Plaintiff's medical records, (2) Plaintiff's treating physicians either were not retained to provide causation opinions or otherwise confirmed the correlation between pudendal neuralgia and pelvic surgery with the use of mesh, (3) Margolis sufficiently rejected alternative causes for Plaintiff's injuries in accordance with Ninth Circuit standards, and (4) Margolis's opinions concerning a patient's future prognosis and need for future medical care have routinely been upheld by other Courts.

As an initial matter, the Court notes that Margolis is a pelvic surgeon and urogynecologist

with extensive experience evaluating and explanting synthetic mesh and sling systems.  Doc. No. 98-3 at 7.  His expert report states that in reaching his opinions, he reviewed scientific literature, Defendant's corporate documents, public domain documents, Defendant's sample products, and the depositions of Defendant's employees and experts.  Doc. No. 98-3 at 8.  Margolis also reviewed the medical records of Ms. Zetz, the depositions of Dale, Hibner, Rogo-Gupta, and Ms. Zetz, and the expert reports of Shih, Pence, and Mays.  Id.  According to Margolis's report, all his opinions are based on his experience, training, knowledge, and reliance on the materials identified above.  Id.  Upon review, the Court will decline to exclude Margolis's opinions regarding the causal relationship between the Obtryx and Ms. Zetz's pudendal neuralgia.

Plaintiffs' argument that Margolis's opinions are not supported by medical literature is unavailing.  While it is true that "case studies alone generally do not prove causation," Margolis's report does not rely only on case studies, and in any event, case studies may be used to "support other proof of causation."  Wendell, 858 F.3d at 1236.  As stated above, Margolis relied on his experience, training, knowledge, and additional literature in reaching his opinions.  See Doc. No. 98-4 at 21-63 (listing all literature Margolis reviewed in reaching his opinions); see also Wendell, 858 F.3d at 1236 (finding experts' testimony reliable and admissible in part because they "relied not just on [case] studies . . . but also on their own wealth of experience and additional literature.").  For example, Margolis's report references the 2020 Joint Position Statement on the Management of Mesh-Related Complications for the FPMRS Specialist, which addresses among other topics complications for patients with transobturator mid-urethral sling-related groin pain.  Doc. No. 98-4 at 24; Doc. No. 112-9 at 7.  Margolis also references a medical publication by the International Urogynecology Association that focuses on complications arising from the use of mesh for stress urinary incontinence.  Doc. No. 98-4 at 32; Doc. No. 112 at 13.  Furthermore, Margolis relied on Ms. Zetz's medical records and the statements of Dale, Hibner, and Rogo-Gupta in reaching his opinions.  Although the medical records do not expressly state that Ms. Zetz's Obtryx sling caused her pudendal neuralgia, some of the records suggest that a relationship exists between the Obtryx sling and Ms. Zetz's symptoms, and they do not definitively state that the Obtryx was not the cause.  Doc. No. 112-6 at 2; Doc. No. 112-7 at 2-3; Doc. No. 112-8 at 6-7.

1    Defendant's argument that Margolis failed to conduct a reliable "differential diagnosis" is
2  also unavailing.  Differential diagnosis is a standard scientific technique of identifying the cause of
3  a medical problem by eliminating the likely causes until the most probable one is isolated.
4  Clausen v. M/V New Carissa, 339 F.3d 1049, 1057 (9th Cir. 2003).  The expert must provide
5  reasons for rejecting alternative hypotheses "using scientific methods and procedures" and the
6  elimination of those hypotheses must be founded on more than "subjective beliefs or unsupported
7  speculation."  Id. at 1058.  The Ninth Circuit does "not require experts to eliminate all other
8  possible causes of a condition for the expert's testimony to be reliable . . . . It is enough that the
9  proposed cause 'be a substantial causative factor.'"  Wendell, 858 F.3d at 1237 (citing Messick v.
10  Novartis Pharm. Corp., 747 F.3d 1193, 1199 (9th Cir. 2014)).  "Given the difficulties in
11  establishing a medical cause and effect relationship, 'causation can be proved even when we don't
12  know precisely how the damage occurred, if there is sufficiently compelling proof that the agent
13  must have caused the damage somehow.'"  Messick, 747 F.3d at 1198 (citing Kennedy v.
14  Collagen Corp., 161 F.3d 1226, 1230 (9th Cir. 1998)).  "[W]hen an expert establishes causation
15  based on a differential diagnosis, the expert may rely on his or her extensive clinical experience as
16  a basis for ruling out a potential cause of the disease."  Wendell, 858 F.3d at 1237 (citing Messick,
17  747 F.3d at 1198).

18    Here, Margolis considered multiple potential causes for Plaintiff's injuries, including her
19  pre-implant medical history involving two cesarean sections, cholelithiasis, menometrorrhagia,
20  dysmenorrhea, and ovarian cyst, as well as her post-implant history of kidney stones, hip
21  arthroplasty, and ovarian cysts.  Doc. No. 98-3 at 45.  Additionally, Margolis considered
22  Plaintiff's other gynecological and non-gynecological conditions.  Id.  Margolis then determined
23  that "[f]rom my experience [Ms. Zetz's pudendal neuralgia] is more likely than not caused by
24  mesh" and that "[t]his is supported by the fact that Mrs. Zetz's symptoms of pudendal neuralgia
25  exist without any evidence of any significant pelvic trauma in temporal relationship to her onset of
26  symptoms."  Id. at 44.  As stated above, Margolis has extensive clinical experience evaluating and
27  explanting synthetic mesh and sling systems as a pelvic surgeon and urogynecologist, and he
28  relied on his experience to rule out potential causes and to propose that the Obtryx sling was the

1   causative factor.  Wendell, 858 F.3d at 1237; Messick, 747 F.3d at 1199.  Although Margolis

2   provides "little explanation as to how he excluded other potential causes," he has "proffered

3   relevant testimony putatively based on a relevant data set and a methodology that the Ninth Circuit

4   has deemed reliable," and whatever defects there may be in his work "go to the weight of his

5   testimony and become fodder for cross-examination."  Enborg v. Ethicon, Inc., 2022 U.S. Dist.

6   LEXIS 47313, *32 (E.D. Cal. Mar. 15, 2022); see also Wendell, 858 F.3d at 1235; Trump v.

7   Intuitive Surgical, Inc., 2020 U.S. Dist. LEXIS 73781, *13 (N.D. Cal. Apr. 24, 2020).

8          Finally, with respect to Margolis's opinions regarding Ms. Zetz's future medical treatment

9   needs, Margolis states he considered her medical history and used his education, experience,

10   training, and review of medical literature to reach his opinions.  Doc. No. 98-4 at 7.  Margolis then

11   opines that "given her clinical course," Ms. Zetz will face a long list of complications during her

12   life expectancy.  Id. at 8-9.  While the Court expresses no reservations regarding Margolis's

13   experiences evaluating and explanting synthetic mesh and sling systems, the Court is concerned

14   with the fact that Margolis did not personally examine Ms. Zetz to corroborate his opinions

15   regarding her anticipated, as opposed to her past, medical complications.  Doc. No. 98-7 at 11.

16   The Court appreciates the potential probative value of the testimony at issue but is concerned that

17   it could be outweighed by risk of confusion and prejudice.  See Fed. R. Evid. 403.  Therefore, the

18   Court will reserve ruling on this issue, subject to some proffer (outside the presence of the jury) as

19   to Margolis's testimony at trial.  See Enborg, 2022 U.S. Dist. LEXIS 47313, at *34-35.

20          B.  Warning Opinions

21          Defendant argues that Margolis's opinions regarding the adequacy of the Obtryx DFU

22   should be excluded on the ground that he is unqualified to testify on the topic.  As explained

23   below, the Court has found that Defendant is entitled to summary judgement on Plaintiff's failure-

24   to-warn claims.  The parties do not show how the above Margolis opinions apply to Plaintiffs'

25   other claims.  Therefore, for purposes of this order, the Court will grant Defendant's motion to

26   exclude Margolis's "warning" opinions on relevance grounds.  See Fed. R. Evid. 402.

27          C.  General Opinions

28          Defendant argues that Margolis's opinions regarding the following general topics should

1   be excluded: (1) biomaterials, (2) polypropylene degradation, (3) chronic foreign body reaction,

2   (4) adequate pore size for polypropylene mesh, (5) adequate weight of polypropylene, (6)

3   biocompatibility of polypropylene, and (7) medical device design and development.[2]  According

4   to Defendant, other courts have found Margolis unqualified to opine on these topics, and

5   Margolis's opinions ignore a large body of contrary evidence.  In response, Plaintiffs concede that

6   Margolis is not a biomaterials expert, but contend that he is qualified to testify as to how the

7   characteristics of the Obtryx influence its clinical performance.  Plaintiffs also assert that other

8   courts have found Margolis qualified to testify about the body's reaction to, and effect on,

9   polypropylene pelvic mesh and the complications caused by those mesh products.

10          The Court finds that Margolis is qualified to opine on the above topics to the extent his

11  opinions concern the mesh's reaction to and effect on the human body.  See Block v. Ethicon, Inc.,

12  2020 U.S. Dist. LEXIS 205148, *4 (S.D. Ind. Nov. 2, 2020); In re Ethicon, Inc., 2016 U.S. Dist.

13  LEXIS 118620, *24-25 (S.D. W. Va. Aug. 30, 2016).  As detailed above, Margolis is a pelvic

14  floor surgeon and urogynecologist with extensive experience evaluating and explanting sling

15  systems.  He is also one of a small group of American physicians who are board certified in the

16  obstetrics and gynecology subspecialty of Female Pelvic Medicine and Reconstructive surgery.

17  Margolis's extensive clinical experience, combined with his review of and contributions to the

18  medical literature, have persuaded several courts that he is qualified to opine on "mesh reaction

19  and its effect on the human body."  See Block, 2020 U.S. Dist. LEXIS 205148, at *4; In re

20  Ethicon, Inc., 2016 U.S. Dist. LEXIS 118620, at *24-25.

21          Defendant's reliance on Flores-Banda v. Boston Scientific Corp., No. 2:13-cv-04434, at

22  *11 (S.D. W. Va. May 9, 2016) is misplaced because the plaintiff in that case did not oppose the

23  exclusion of Margolis's testimony on the above topics beyond the basic assertion that Margolis

---

[2] Defendant also argues that Margolis is unqualified to opine regarding (1) marketing, (2) the chemical properties of polypropylene mesh, (3) that the Burch procedure and other SUI surgical procedures are more effective than polypropylene slings; (4) that Xenform slings are more effective than polypropylene slings; and (5) that the infection rate of polypropylene mesh is 100%.  Plaintiffs' briefing does not contest Defendant's motion to exclude regarding the Burch procedure, Xenform sling, marketing, or the alleged 100% infection rate of polypropylene mesh.  See Doc. No. 112 at 26-27.  The parties also do not adequately explain how opinions on "chemical properties of polypropylene mesh" differ from the other opinions regarding the properties (e.g., biomaterials, degradation, pore size, weight, etc.) of polypropylene mesh.  Therefore, for purposes of this order, the Court will grant Defendant's motion to exclude these topics.

1   was an established urogynecologist with years of experience with pelvic mesh products.  This is

2   not the case here, given that Plaintiffs expressly oppose Defendant's argument and cite medical

3   literature Margolis reviewed and other court opinions that deemed Margolis qualified to opine on

4   the above topics.  Defendant's argument that the *Flores-Banda* plaintiff did not oppose the

5   exclusion because "those same opinions had been challenged, successfully, on the very same

6   grounds in numerous cases before" is not persuasive.  Doc. No. 118 at 10-11.  Defendant has not

7   identified any earlier case in which a plaintiff presented such an opposition on the merits but

8   failed.  Additionally, an earlier case involving Defendant indicates that the court interpreted the

9   plaintiff's concession—i.e., "to the extent these subjects are outside of Dr. Margolis's expertise,

10  'Dr. Margolis will be instructed to limit his opinion and avoid these areas'"—not as an admission

11  that Margolis was not qualified to testify on those topics but rather as "intentional ambiguity" that

12  the court refused to analyze.  Frankum v. Bos. Sci. Corp., 2015 U.S. Dist. LEXIS 57251, *28-29

13  (S.D. W. Va. May 1, 2015).  If Defendant believes evidence exists that contradict Margolis's

14  opinions, then Defendant may use that evidence to cross-examine Margolis at trial.

15           D.  State of Mind Opinions

16           Defendant looks to exclude Margolis's opinions regarding the state of mind or intent of

17  Defendant and other third parties on the ground that they will not assist the jury.  Defendant also

18  looks to exclude any testimony by Margolis that attempts to "interpret" or "narrate" Defendant's

19  corporate documents on the ground that the jury is equally capable of interpreting and reaching

20  their own conclusions from these documents.  In response, Plaintiff argues that Margolis expresses

21  no such opinions in his report and that he should not be precluded from relying on Defendant's

22  documents and testimony to opine on whether information that was available to Defendant at a

23  given time would have impacted a doctor's risk-benefit analysis or a patient's decision-making if

24  it had been made known.

25           Other courts in similar surgical mesh cases have found that Margolis may not testify about

26  Defendant's state of mind, knowledge, or intent because that would usurp the jury's fact-finding

27  function.  See Eghnayem v. Bos. Sci. Corp., 57 F. Supp. 3d 658, 670 (S.D. W. Va. 2014); Tyree v.

28  Bos. Sci. Corp., 54 F. Supp. 3d 501, 517-18 (S.D. W. Va. 2014).  These courts also ruled that

1  "[a]lthough an expert may testify about his or her review of internal corporate documents solely

2  for the purpose of explaining the basis for his or her opinions—assuming the opinions are

3  otherwise admissible—a party's knowledge, state of mind, or other matters related to corporate

4  conduct and ethics are not appropriate subjects of expert testimony because opinions on these

5  matters will not assist the jury."  Eghnayem, 57 F. Supp. 3d at 670; Tyree, 54 F. Supp. 3d at 517-

6  18.  The Court agrees with the reasoning in these cases and, therefore, finds that Margolis may

7  testify about his review of Defendant's corporate documents solely for the purpose of explaining

8  the basis for his opinions, assuming those opinions are otherwise admissible.

9          **2.  Peggy Pence**

10          Defendant looks to exclude Pence's opinions regarding the polypropylene mesh and

11  labeling on the ground that she is not qualified.  Defendant also looks to exclude Pence's opinions

12  regarding (1) the adequacy of Defendant's premarket clinical testing, (2) the adequacy of

13  Defendant's product labeling, (3) the adequacy of Defendant's post-market vigilance, (4)

14  Defendant's state of mind, intent, and factual narratives, (5) the carcinogenicity of polypropylene

15  mesh, and (6) disclosures that Defendant allegedly failed to make.  The Court will address each

16  argument in turn below.

17          A.  Qualifications

18          Other courts have found Pence qualified to testify in similar cases.  See Eghnayem, 57 F.

19  Supp. 3d at 694 (S.D. W. Va. 2014); Tyree, 54 F. Supp. 3d at 540 (S.D. W. Va. 2014); see also

20  Bethune v. Bos. Sci. Corp., 2016 U.S. Dist. LEXIS 66449, *20 (S.D. W. Va. May 19, 2016);

21  Carlson v. Bos. Sci. Corp., 2015 U.S. Dist. LEXIS 55282, *62 (S.D. W. Va. Apr. 28, 2015);

22  Sanchez v. Bos. Sci. Corp., 2014 U.S. Dist. LEXIS 137189, *87-*88 (S.D. W. Va. Sep. 29, 2014).

23  The Court agrees with the reasoning in such cases and, therefore, finds that Pence is qualified to

24  render the opinions set forth in her expert report.

25          B.  Clinical Testing Opinions

26          Other courts have considered Pence's opinions regarding the adequacy of a defendant's

27  premarket clinical testing for similar mesh products, and those courts deemed her opinions

28  reliable.  See, e.g., Eghnayem, 57 F. Supp. 3d at 694-95; Tyree, 54 F. Supp. 3d at 540-41; Enborg,

2022 U.S. Dist. LEXIS 47313, at *9.  As in those cases, Defendant has not persuaded the Court that none of the authorities cited by Pence requires or recommends that mesh manufacturers conduct premarket clinical trials.  Several guidance documents cited by Pence supply a basis for her opinions.  The National Institute for Health and Care Excellence ("NICE") and French National Authority for Health ("HAS") studies both emphasize the importance of clinical trials in assessing a product's safety for surgical use.  Pence also relied on Global Harmonization Task Force ("GHTF") standards in opining that Defendant should have conducted premarket clinical trials on its mesh products.  "[A]ll of these documents carry the indicia of reliability set forth by *Daubert*: the conclusions were reached after documented and validated testing, the results were published, and the testing was conducted through a defined methodology described in each paper." Bethune, 2016 U.S. Dist. LEXIS 66449, at *21-23; see also Eghnayem, 57 F. Supp. 3d at 695.  To the extent Defendant is challenging Pence's discussion of these standards in her report or how she applied them in forming her opinions, this challenge goes to the weight of Pence's testimony, not its reliability, and therefore are better suited for cross-examination at trial.

### C.  Product Labeling Opinions

Other courts have excluded Pence's opinions regarding the adequacy of a defendant's product labeling for similar mesh products.  See, e.g., Eghnayem, 57 F. Supp. 3d at 695-97; Tyree, 54 F. Supp. 3d at 542-43; Bethune, 2016 U.S. Dist. LEXIS 66449, at *23-25.  These courts reasoned that Pence's testimony relating to the FDCA or FDA was inadmissible because it could lead to substantially more jury confusion than enlightenment.  See Eghnayem, 57 F. Supp. 3d at 697; Tyree, 54 F. Supp. 3d at 543.  Additionally, subsequent courts found that Pence's reliance on the GHTF did not cure her opinion's earlier shortcomings because "[t]he GHTF document on product labels does not state—expressly or otherwise—that manufacturers should include the severity, frequency, and permanency of adverse events in a warning, nor does it state that a label should qualify the difficulty of removing the device."  See, e.g., Bethune, 2016 U.S. Dist. LEXIS 66449, at *24.  The Court agrees with the reasoning in these cases and finds that Pence's opinion, that Defendant should have included information in its labels on the difficulty of mesh removal and the permanency, severity, and frequency of adverse events, is unreliable.  Id. at *25.

However, as in these other cases, the Court will not exclude Pence's remaining opinions on product labeling because she considered the GHTF's Label and Instructions for Use for Medical Devices, the DFU, Defendant's corporate documents, and other medical and scientific literature. Id. This collection of sources is sufficient for the purposes of *Daubert*, and Defendant may cross-examine and impeach Pence at trial regarding any perceived oversights in her analysis.

### D. Post-Market Vigilance Opinions

Other courts have considered Pence's opinions regarding the adequacy of a defendant's post-market vigilance for similar mesh products, and found them unreliable. See, e.g., Eghnayem, 57 F. Supp. 3d at 697-98; Tyree, 54 F. Supp. 3d at 543-44; see also Long v. Bos. Sci. Corp., 2018 U.S. Dist. LEXIS 93072, *563-64 (S.D. W. Va. May 29, 2018). These courts reasoned that Pence arrived at her opinions concerning post-market vigilance by exclusively considering data from the FDA's MAUDE database, which had no bearing on whether Defendant provided adequate warnings or whether its products were defective. While Plaintiffs argue that Pence also based her opinions on GHTF guidance, other courts still reached the same conclusion even after Pence supplemented her opinion by also relying on GHTF guidance documents. Long, 2018 U.S. Dist. LEXIS 93072, at *564 ("Pence's opinion that 'BSC failed to comply with the industry standard of care' is still based on BSC's perceived noncompliance with FDA rules and regulations and GHTF/IMDRF guidance documents."). The Court agrees with the reasoning in these cases and, therefore, finds that Pence's opinion on Defendant's inadequate post-market vigilance is not reliable.

### E. State of Mind Opinions

Defendant looks to exclude Pence's opinions regarding the state of mind or intent of Defendant and any testimony by Pence that attempts to "interpret" or "narrate" Defendant's corporate documents. In response, Plaintiffs concede that they will not elicit testimony from Pence on Defendant's state of mind, but they argue that Defendant's "narratives" attack is unfounded.

Other courts have found that Pence may testify about her review of Defendant's corporate documents solely for the purpose of explaining the basis for her opinions, assuming the opinions

are otherwise admissible.  See Eghnayem, 57 F. Supp. 3d at 670; Tyree, 54 F. Supp. 3d at 517-18.
The Court agrees with the reasoning in these cases and, therefore, finds that Pence may testify
about her review of Defendant's corporate documents solely in this manner.

### F.   Carcinogenicity Opinions

Defendant argues that Pence's opinions regarding the carcinogenicity of polypropylene
mesh must be excluded.  Plaintiffs do not contest this argument and concede that Pence is not
offering any opinions as to whether polypropylene is a human carcinogen.  Doc. No. 113 at 21.
Therefore, the Court will grant Defendant's motion to exclude on this point.

### G.   Failure to Disclose Opinions

Defendant argues that Pence's opinion, that Defendant failed to conduct appropriate testing
or disclose certain information to the FDA as part of the 510(k) process, should be excluded on the
ground that such opinions are preempted by Buckman Co. v. Plaintiffs Legal Committee, 531 U.S.
341 (2001) and PLIVA v. Mensing, 564 U.S. 604 (2011).  In response, Plaintiffs claim that their
state tort claims are not preempted under the Federal Food, Drug and Cosmetic Act § 360 because
that act does not preempt claims involving medical devices approved through the 510(k) process,
such as the Obtryx device at issue.  Based on the rulings of several courts on the inadmissibility of
FDA evidence in similar cases, the Court is reluctant to allow Pence to "[d]elv[e] into complex
and lengthy testimony about regulatory compliance [that] could inflate the perceived importance
of compliance and lead jurors 'to erroneously conclude that regulatory compliance proved
safety.'"  Bowling v. C. R. Bard, Inc., 2017 U.S. Dist. LEXIS 42017, *9 (S.D. W. Va. Mar. 23,
2017).  Because the section 510(k) clearance process does not speak directly to safety and
efficacy, it is of negligible probative value.  Id.  Accordingly, testimony related to the section
510(k) process, including subsequent enforcement actions and discussion of the information
Defendant did or did not submit in its section 510(k) application, is excluded.

### 3.   Ie-Ming Shih

Defendant argues that Shih's clinical causation opinions regarding polypropylene mesh
should be excluded because (1) he is not qualified to offer such opinions, (2) his opinions are
based on unreliable methodology, and (3) his opinions offer no assistance to the trier of fact.  The

1  Court will address each argument in turn below.

2         A.  Qualifications

3         Defendant argues that any opinion by Shih, a pathologist, regarding the causal relationship

4  between Plaintiff's Obtryx and her symptoms are beyond his knowledge, skill, experience,

5  training, and education.  According to Defendant, Shih did not study polypropylene mesh during

6  his fellowship training, did not work on polypropylene mesh implants during his residency, did

7  not address polypropylene or mesh implants during his faculty appointments, and has not lectured

8  or published a peer-reviewed article on polypropylene implants to treat stress urinary

9  incontinence.  In response, Plaintiffs assert that Shih has not been offered as a causation expert but

10 rather as a pathologist to opine on his findings and analysis of tissue samples from Ms. Zetz.

11        Shih's report states that he reviewed tissue samples removed from Ms. Zetz under a Nikon

12 microscope (eClipse Ci).  Doc. No. 103-3 at 3.  The report further states that the samples

13 "displayed a consistent pattern of scarring (fibrosis)," and that "chronic inflammation and foreign

14 body reaction (FBR, including foreign body giant cells) can be detected surrounding the mesh

15 insertion areas."  Id.  According to the report, "[e]xtensive fibrosis can be observed, indicating a

16 progression of the disease from inflammation to scarring/fibrosis," and "mesh fiber associated

17 patterns of scarring were also seen including encapsulation (i.e., scarring around the area of mesh),

18 bridging fibrosis (i.e., scarring within the mesh pores and between the mesh fibers) and formation

19 of mesh scar plates (i.e., scar tissue surrounding the entire mesh)."  Id.  Shih states that in arriving

20 at his opinions, he relied on his background, training, experience, and review of Ms. Zetz's tissue

21 slides.  Id.

22        Upon review, the Court finds that Shih is qualified to opine on the presence of fibrosis,

23 chronic inflammation, and foreign body reaction that he observed during his examination of the

24 tissue samples.  Shih stated during his deposition that "[p]athology is to describe what we find

25 under a microscope," Doc. No. 103-4 at 183, and that chronic inflammation, for example, "is a

26 pathological finding."  Id. at 114.  Defendant does not deny that Shih's description of the presence

27 of fibrosis, chronic inflammation, and foreign body reaction in the tissue samples is a form of

28 pathological practice.  Therefore, the Court will decline to exclude Shih's opinions on this matter

because Shih is qualified to testify on pathologic findings.  However, as Plaintiffs concede, Shih may not opine on the cause of Ms. Zetz's clinical complications, including any opinion correlating his pathologic findings with her alleged clinical symptoms.  Shih stated during his deposition that "[w]e don't have any opinion about the clinical course which need to be deferred to, again, a caring physician."  Doc. No. 103-4 at 183.  Accordingly, any opining on the cause of Ms. Zetz's clinical complications will be beyond Shih's purview.

B.  Reliability

Defendant argues that Shih neither developed a methodology for reaching his pathologic findings nor adopted a methodology developed by someone else.  In response, Plaintiffs argue that Shih simply reported the pathology finding he saw under a microscope and in the photomicrographic images of the slides.

The key *Daubert* inquiry is "whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions."  Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1317 (9th Cir. 1995).  Here, Defendant does not provide any reason to doubt that Shih's method of analyzing the tissue slides fell within the range of accepted standards for pathologists.  The record does not show that Shih opportunistically chose certain tissue samples or that he ignored certain findings in order to reach predetermined conclusions.  Rather, the record indicates that he examined the tissue samples under a Nikon microscope (eClipse Ci), identified the presence of any abnormalities, and captured photomicrographic images of the samples.  Although Shih acknowledges that he did not cite or rely on any scientific literature in reaching his opinions, the Court has no reason to doubt the reliability of Shih's description of the presence of fibrosis, chronic inflammation, and foreign body reaction in the samples based on his accomplished background and extensive training and experiences as a pathologist.  Defendant's concerns regarding Shih's interpretation of the slides may be fodder for cross-examination.

C.  Assistance to Trier of Fact

Defendant argues that Shih's opinions will not assist the trier of fact because while Plaintiff's mesh specimens show foreign body reaction, Shih does not opine that they are specific

17

to polypropylene or issues in dispute in this case.  In response, Plaintiffs disagree with Defendant's interpretation of Shih's report, and contend that accepting Defendant's argument would entail improper exclusion of expert testimony on the ground that one set of facts is preferable to the court over another set of facts.

The Court agrees with Plaintiff that a trial court should not exclude an expert's testimony on the ground that the court believes one set of facts and not the other.  Whether Shih's testimony on the presence of fibrosis, chronic inflammation, and foreign body reaction is helpful to the jury is a question for the jury to decide.

**4.  Jimmy Mays**

Defendant argues that Mays's opinions on clinical complications should be excluded on the ground that he is unqualified to make such opinions.  Defendant also asserts that Mays's opinions on polypropylene degradation in the human body and on safer alternative designs should be excluded as unreliable.  Furthermore, Defendant argues that Mays's state-of-mind opinions and legal conclusions should be excluded. The Court will address each argument in turn below.

A.  Clinical Complications

Defendant argues that Mays is unqualified to opine on clinical complications because he is a polymer chemist, not a medical doctor or biomaterials engineer.  According to Defendant, Mays cannot ascribe a particular complication to polypropylene mesh degradation or the alleged loss of mechanical properties.  In response, Plaintiffs argue that he is qualified to offer opinions on polypropylene, oxidative degradation, antioxidants, and the effect of polypropylene mesh in the human body.  Plaintiffs contend that Mays has general expertise in biomaterials, that he has experience teaching courses on polymeric materials to biomedical engineers, and that he has developed polymer products for biological applications.

Other courts have found Mays qualified to "testify generally about polypropylene degradation based on his experience and review of the literature." Eghnayem, 57 F. Supp. 3d at 689-90; Tyree, 54 F. Supp. 3d at 538.  However, other courts ruled that Mays is not qualified to opine on "medical complications that are caused by alleged mesh degradation" because Mays is not a medical doctor, he has not examined patients, and he has not conducted differential

diagnoses.  In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig., 2016 U.S. Dist. LEXIS

116804, *32 (S.D. W. Va. Aug. 25, 2016); Arevalo v. Coloplast Corp., 2020 U.S. Dist. LEXIS

124417, *21 (N.D. Fla. July 7, 2020).  Plaintiffs concede that Mays is not offering opinions on the

medical complications associated with degradation but is opining that due to its chemical structure

and physical properties, polypropylene mesh undergoes oxidation generally, resulting in a

breakdown of its mechanical properties.  Doc. No. 111 at 14.  In light of Plaintiffs' concession and

the rulings of other courts, the Court finds that Mays is qualified to testify generally that

polypropylene is susceptible to oxidation and degrades but is not qualified to opine on medical

complications caused by polypropylene degradation.  Eghnayem, 57 F. Supp. 3d at 690.

B.  Degradation

Defendant argues that Mays's opinions on polypropylene degradation in the human body

based on thermogravimetric analysis ("TGA") should be excluded as unreliable.  Defendant also

asserts that Mays's opinions based on his co-authored *Imel* article[3] should be excluded because the

testing performed in that article was found unreliable by other courts.  According to Defendant,

the testing performed in the *Imel* article is flawed because (1) the samples were tested without any

controls for error or selection bias, (2) a testing protocol was neither put in writing nor adhered to,

and (3) the bleach treatment performed on the testing samples failed to remove all biological

material from those samples.  Furthermore, Defendant argues that Mays's additional reliance on

new textbooks and scientific studies does not save his opinions based on TGA testing and the *Imel*

article.

In response, Plaintiffs first contend that Mays's opinion that polypropylene is susceptible

to oxidation and degrades inside the human body does not rest on his TGA but rather on his

review of published literature and his knowledge of chemistry, polymer science, and the behavior

of polymeric materials.  Additionally, Plaintiffs argue that Mays's reliance on the *Imel* article is

appropriate because the testing performed in that article adhered to the standard methodology

recognized in his field, and the article passed the peer-review process before publication.

Furthermore, Plaintiffs assert that Defendant's questions regarding the *Imel* article go to the

---

[3] Adam Imel et al., In Vivo *Oxidative Degradation of Polypropylene Pelvic Mesh*, 73 Biomaterials, 131 (2015).

weight, not the admissibility, of the evidence.

Other courts have excluded Mays's opinions that were based on his TGA on the ground that no reliable connection existed between the TGA results and his conclusions about polypropylene degradation in the human body.  See Eghnayem, 57 F. Supp. 3d at 687-88; Tyree, 54 F. Supp. 3d at 535-37; Long, 2018 U.S. Dist. LEXIS 93073, at *562; Bethune, 2016 U.S. Dist. LEXIS 66449, at *18.  Additionally, other courts have excluded Mays's opinions regarding *in vivo* oxidative degradation of polypropylene that were based solely on his review of the *Imel* article on the ground that the testing performed in the article was unreliable.  Arevalo, 2020 U.S. Dist. LEXIS 124417, at *20 (citing Tyree, 54 F. Supp. 3d at 532-37 and Franco v. Bos. Sci. Corp., 2016 U.S. Dist. LEXIS 76469, *19-20 (S.D. W. Va. June 13, 2016)).  The Court agrees with the reasoning of these courts and, therefore, will exclude Mays's opinions that are based on his TGA or *Imel* article.  Mays is nevertheless "permitted to testify generally that polypropylene is susceptible to oxidation and degrades, without specifically referencing the unreliable testing he conducted with Dr. Gido."  Eghnayem, 57 F. Supp. 3d at 690.

C. Safer Alternatives

Defendant argues that Mays's opinions regarding safer alternatives to polypropylene mesh are unreliable because (1) further biocompatibility testing is needed to support his opinions, (2) he reached his opinions based only on a literature search, and (3) Mays has not tested or analyzed polyethylene or PVDF as replacement materials in mesh products.  In response, Plaintiffs assert that a study by Dr. Uwe Klinge provides reliable findings that PVDF is inherently resistant to oxidation and has not been shown to experience degradation.

The Court finds that Mays's opinions concerning whether polyethylene and PVDF are safer alternatives to polypropylene are a subject of cross examination and go to weight and not admissibility.  See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig., 2018 U.S. Dist. LEXIS 243729, at *16 (S.D. W. Va. July 26, 2018) ("To the extent [defendant] argues that Dr. Klinge's testimony that PVDF was a safer alternative is unreliable because PVDF was not cleared by the FDA, this does not render Dr. Klinge's testimony unreliable. This has no bearing on whether PVDF mesh is a safer alternative to other mesh products.").

1    D. <u>State of Mind</u>

2    Defendant argues that Mays's opinions pertaining to Defendant's conduct, state of mind,

3   or motivation are improper because these opinions will not assist the jury.  Defendant also argues

4   that Mays's opinions as to reasons that Chevron Phillips included certain language in the MSDS

5   are irrelevant and improper.  In response, Plaintiffs assert that Mays will not testify as to

6   Defendant's state of mind but will testify regarding Defendant's alleged failure to take into

7   account polypropylene's propensity for oxidation during design of its seven pelvic repair meshes.

8   Additionally, Plaintiffs contend Mays is permitted to testify regarding his review of internal

9   corporate documents to explain the basis for his opinions.

10    As other courts have ruled in similar cases, the Court finds that Mays's opinions on

11   Defendant's state of mind are not helpful to the jury.  <u>See</u> <u>Eghnayem</u>, 57 F. Supp. 3d at 691;

12   <u>Tyree</u>, 54 F. Supp. 3d at 539; <u>Long</u>, 2018 U.S. Dist. LEXIS 93073, at *562-63.  However, Mays

13   may testify about his review of corporate documents solely for the purpose of explaining the basis

14   for his opinions, assuming those opinions are otherwise admissible.

15    E. <u>Legal Conclusions</u>

16    Defendant argues that the following opinions of Mays are inadmissible legal conclusions:

17    (1) The change in materials properties of a material implanted in the female pelvis
18        poses unreasonable risk of harm and is defective from a design perspective in
         terms of the material choice made by Boston Scientific.

19    (2) From a materials science and polymer engineering perspective, Marlex
20        polypropylene . . . foreseeably cannot perform as intended, where intended, for
         as long as intended, posing a substantial risk for the person for whom it is
21        intended, and is thus unreasonably dangerous to sell for the uses Boston
         Scientific sold it for. Boston Scientific was unreasonable, based on the
22        scientific and engineering knowledge available, to sell these devices for the
         intended applications.

23    In response, Plaintiffs contend that Mays is not offering legal conclusions but rather

24   opinions on his subject of expertise, polymer science.

25    The Ninth Circuit "has repeatedly affirmed that 'an expert witness cannot give an opinion

26   as to her legal conclusion, i.e., an opinion on an ultimate issue of law.'"  <u>United States v. Diaz</u>,

27   876 F.3d 1194, 1197 (9th Cir. 2017) (quoting <u>Hangarter v. Provident Life & Accident Ins. Co.</u>,

28   373 F.3d 998, 1016 (9th Cir. 2004)).  Here, whether Defendant failed to act as a reasonable and

prudent medical device manufacturer is a question for the jury.  See Eghnayem, 57 F. Supp. 3d at 691; Tyree, 54 F. Supp. 3d at 539.  As a polymer scientist, Mays may offer opinions that he does not believe the Obtryx is suitable to serve as a permanent implant, but his opinions cannot be phrased as legal conclusions.  Therefore, the two above statements are excluded.

### 5.  **Robert Tremp**

Defendant argues that Tremp's opinions should be excluded because they rest on Margolis's inadmissible causation opinions.  Additionally, Defendants look to exclude Tremp's Life Care Plan and any related testimony concerning certain items and services on that plan.  Furthermore, Defendant asserts that Tremp is not qualified to offer medical opinions as to Plaintiff's medical needs because Tremp is neither a psychiatrist nor a doctor.  Finally, Defendant contends that Tremp's opinions regarding Ms. Zetz's urology care that are based on his correspondence with Dr. Jamie DiPietro lack foundation and are unreliable.  The Court will address each argument in turn below.

### A.  Margolis's Causation Opinions

Because the Court declined to exclude the causation opinions of Margolis, Tremp's opinions do not rest on inadmissible causation opinions.  Therefore, this part of Defendant's motion will be denied.

### B.  Life Care Plan Items and Services

Defendant argues that Tremp's Life Care Plan and any related testimony concerning certain items and services on that plan should be excluded.  According to Defendant, Ms. Zetz testified that she does not partake in or require (1) psychological evaluation or individual counseling, (2) home health assistance, (3) use of a wheelchair, walker, or shower chair, (4) use of a power scooter, (5) use of a power lift recliner, bed rail, or grab bars on a raised toilet seat, (6) visits with a neurologist, and (7) visits with a urologist.  In response, Plaintiffs argue that Tremp, as a Certified Life Care Planner and Certified Rehabilitation Counselor, is qualified to render opinions concerning the medical services required in the Life Care Plan.  Additionally, Plaintiffs assert that Defendant misrepresents Ms. Zetz's testimony because she in fact does use some of the listed items and services and may require the others in the future.

As an initial matter, the Court agrees with Plaintiffs that even though Ms. Zetz may not currently use an item or service on the plan, she may need to do so in the future.  Accordingly, the Court will not exclude any opinion that reliably indicates that Ms. Zetz will require a specific medical item or service in the future.  According to Tremp's report, Ms. Zetz will require the items and services listed above based on his review of Ms. Zetz's medical records, the deposition transcripts of Hibner and Rogo-Gupta, and recommendations he received from Hibner and DiPietro.  With respect to "psychological evaluation" and "individual counseling," the report indicates under the "Recommended By" column that Tremp's opinions were recommended by "Robert P. Tremp, Jr., MA, CRC, CLCP based on medical information, client interview and foundational research."  Doc. No. 101-3 at 29, 31.  The report does not indicate whether Hibner, Rogo-Gupta, or DiPietro also recommended these treatments.  Tremp's recommendation alone does not reliably indicate that Ms. Zetz will require these treatments in the future.  Whether Ms. Zetz will one day require these services is a question better suited for a doctor, psychiatrist, or psychologist to make.  Therefore, Tremp's opinions regarding Ms. Zetz's need for "psychological evaluation" and "individual counseling" will be excluded.

With respect to "home health aide," "wheelchair," "walker," "shower chair," "power scooter," "power lift recliner," "bed rail," and "grab bars on a raised toilet seat," the report indicates under the "Recommended By" column that Tremp's opinions were recommended by "Robert P. Tremp, Jr., MA, CRC, CLCP based on medical information and client interview."  Id. at 33-41.  The Court will decline to exclude these opinions because Tremp's testimony as a Certified Life Care Planner and Certified Rehabilitation Counselor reliably indicates that Ms. Zetz will require these treatments in the future.  If Defendant remains doubtful, then it may cross examine Tremp at trial and present opposing evidence.

With respect to urological treatment, Tremp's report indicates under the "Recommended By" column that his opinions were recommended by "Jamie DiPietro, M.D."  Id. at 42-45; see also id. at 10 ("Jamie DiPietro, M.D., Urologist, provided the following recommendations on 8/24/19: Autumn will need to be seen by urology 3 to 5 times per year for life.").  While the Court appreciates that Tremp's opinions above appear backed by a urologist, these opinions present

factual and hearsay concerns and could be outweighed by risk of confusion and prejudice. Therefore, the Court will reserve ruling on this issue, subject to some proffer (outside the presence of the jury) as to Tremp's testimony at trial.

Finally, with respect to neurological treatment, the record does not clearly indicate whose recommendation provided the basis for Tremp's opinion. Under the "Recommended By" column, Tremp's report states "Frequency based on schedule with Perminder Bhatia, M.D." Id. at 43. This does not reliably indicate that Bhatia supported Tremp's opinion or that Ms. Zetz will require neurological treatment in the future. Therefore, Tremp's opinion regarding Ms. Zetz's need for neurological treatment will be excluded.

      C.  Qualifications for Medical Opinions

Defendant argues that Tremp is not qualified to include recommendations for mental health services in the Life Care Plan because he is neither a psychiatrist nor psychologist and has no experience in mental health diagnosis. Additionally, Defendant contends that because Tremp is not a medical doctor, he is not qualified to render opinions or recommendations for Plaintiff's medical needs. In response, Plaintiffs argue that as a Certified Life Care Planner and Certified Rehabilitation Counselor with a Master's degree in Special Education and Rehabilitation Counseling, Tremp is qualified to render the opinions contained in his report. Plaintiffs also assert that Tremp relied on Ms. Zetz's medical records, the deposition transcripts of Hibner and Rogo-Gupta, and the "future treatment recommendations" he received from Hibner and DiPietro. Furthermore, Plaintiffs argue that many of the medical care treatments that Tremp recommends are not the type of treatments that must be prescribed by a medical doctor.

As discussed above, Tremp's report does not indicate that its recommendations for "psychological evaluation" and "individual counseling" were made based on any recommendation from Hibner, Rogo-Gupta, or DiPietro. Instead, the report states that the recommendations were made only by Tremp. Doc. No. 101-3 at 29, 31. Notwithstanding Tremp's qualifications as a MA, CRC, and CLCP, whether Ms. Zetz will one day require these mental health services is a question better suited for a doctor, psychiatrist, or psychologist to make. Therefore, the Court will exclude Tremp's opinions regarding Ms. Zetz's need for "psychological evaluation" and

24

"individual counseling."

With respect to Ms. Zetz's medical needs, Tremp's report indicates that its recommendations concerning "physical therapy," "pelvic floor physical therapy," "valium," "gynecological surgeon specialist," "ketamine," and "bilateral pudendal nerve" were made based on recommendations from Hibner. Id. at 10, 30-46. While the Court appreciates that Tremp's opinions above appear backed by a doctor, they present factual and hearsay concerns and could be outweighed by risk of confusion and prejudice. Therefore, the Court will reserve ruling on this issue, subject to some proffer (outside the presence of the jury) as to Tremp's testimony at trial.

D. Urology Care

Defendant argues that Tremp's report opines that Plaintiff will require a urologist, pelvic X-rays, pathology lab studies, renal ultrasounds, and renal scans through her life expectancy, based on the recommendations of DiPietro. According to Defendant, these opinions are baseless because DiPietro is not Ms. Zetz's current treating urologist, and she admitted that she ignored DiPietro's recommendations and instead took another treatment plan route. In response, Plaintiffs contend that the above recommendations by Tremp are proper because he made them at the time when Ms. Zetz was receiving care from DiPietro and because her opting for a different treatment plan route does not negate the need for additional treatment by a urologist.

As stated above, Tremp's opinions regarding urological care present factual and hearsay concerns and could be outweighed by risk of confusion and prejudice. Therefore, the Court will reserve ruling on this issue, subject to some proffer (outside the presence of the jury) as to Tremp's testimony at trial.

**6. Darryl Zengler**

Defendant argues that Zengler's opinions should be excluded because (1) they rest on Tremp's unsupported opinions, (2) Zengler's $6.83 million damages figure fails to account for required error rates, (3) Zengler failed to consider facts in Plaintiff's case, and (4) Zengler's methodology lacks objective foundation. The Court will address each argument in turn below.

A. Tremp's Opinions

Defendant argues that Zengler's report relied on Tremp's Life Care Plan in reaching its

opinion that Plaintiff suffered economic damages of $6.83 million in present cash value.
Defendant asserts that because Tremp's Life Care Plan is inadmissible, Zengler's opinion lacks
any basis and thus is also inadmissible.

As stated above, the Court excluded the opinions in Tremp's Life Care Plan regarding
recommendations for future psychological evaluations, individual counseling, and neurological
treatment. The Court also reserved its ruling on whether Tremp's recommendations regarding
future urological care and certain medical needs should be excluded at trial. The Court declined to
exclude the remaining recommendations by Tremp. Accordingly, the Court will grant
Defendant's motion to the extent Zengler's opinions rest on Tremp's recommendations for future
psychological evaluations, individual counseling, and neurological treatment. The Court will
reserve its ruling on whether to exclude Zengler's opinions that are based on Tremp's
recommendations for future urological care and select medical needs at trial.

B. Error Rates

Defendant argues that Zengler's report is unreliable in that it provides a single figure of
$6.83 million for Plaintiff's future damages without accounting for any error rate. Defendant
further asserts that Zengler admitted that he is not qualified to incorporate error rates in his
analysis. In response, Plaintiffs argue that Zengler's damages figure is reliable because, as a
forensic economist, Zengler relied on standard documents generally accepted by forensic
economists to construct a damages model and form conclusions based on the model. Plaintiffs
further assert that Zengler testified that a known error rate for the total $6.83 million figure cannot
at any rate be meaningfully determined.

Upon review, the Court finds that the lack of an error rate does not make Zengler's
damages figure unreliable. Zengler testified that he reviewed the Plaintiffs' tax returns, W-2
statements, Mr. Tremp's report, and government produced documents including but not limited to
life expectancy, interest rates, inflation rates, pension plan definitions, and wage information in
preparing his report. Zengler further testified that to determine the $6.83 million figure, he applied
the standard constant growth model which is a financial model to project out one's future value
and then discounted it back to present cash value. Doc. No. 102-4 at 39. This is the methodology

1  Zengler used as a forensic economist in all his personal injury cases, id. at 42, and Defendant has

2  not identified a single case in which Zengler's damages opinion was found unreliable for lacking

3  an error rate.  Furthermore, notwithstanding Defendant's contention that Zengler failed to account

4  for any error rate, Zengler testified that an overall error rate cannot be determined "in a

5  meaningful way" while applying the constant growth model.  Id. at 43.  If Defendant has any

6  doubts regarding Zengler's calculations, then it may cross examine Zengler at trial.

7        C.  Consideration of Critical Facts

8        Defendant argues that Zengler's opinions are unreliable because he failed to consider

9  various offsets specific to Plaintiffs' claimed losses, including Plaintiff's eligibility for social

10  security disability insurance, Plaintiff's eligibility for Medicare payments, and the health insurance

11  she receives through her husband's employment.  Defendant also asserts that Zengler's opinions

12  are unreliable because he included costs for services that Ms. Zetz does not need, and because the

13  timeframe of Zengler's damages calculation begins from all the way back to when Plaintiff

14  received her implant in August 2008 when it should have begun in July 2018 when Plaintiff first

15  reported issues and pain.

16        In response, Plaintiffs argue that Zengler based his opinion on facts typically reviewed by

17  forensic economists in preparing an economic damages report.  Plaintiffs further assert that

18  Zengler's damages calculations would not have changed even if Ms. Zetz was found totally

19  disabled because it is ultimately up to the trier of fact to determine what proportion of damages is

20  attributable to the Obtryx.  Furthermore, Plaintiffs argue that although Ms. Zetz does not currently

21  need a home health aide, she does rely on others including a housekeeper to assist her and may

22  need a home health aide in the future.  Finally, Plaintiffs contend that the starting date for

23  Zengler's damages calculation is for the fact finder to decide because they will determine when

24  Ms. Zetz's injuries occurred.

25        The Court finds that Defendant's challenges go to the weight of the evidence, not its

26  admissibility, and they can be addressed though cross examination and presentation of contrary

27  evidence at trial.  Olszeski v. Ethicon Women's Health & Urology, 2022 U.S. Dist. LEXIS 65947,

28  *52-53 (N.D. Ohio Apr. 8, 2022).

D. Methodology

Defendant argues that Zengler's opinions do not rely on proper methodology because in determining his final damages amount, he chose 4.5% as the inflation estimate for hospital inflation projections and rejected the 2.9% inflation figure provided by the Center for Medicare and Medicaid Studies.  Defendant also asserts that Zengler admitted that his assessments of Plaintiff's future lost wages are subjective.  In response, Plaintiffs argue that Zengler's methodology is in line with that of other experts in the forensic economics field.  Specifically, Plaintiffs assert that Zengler applied the standard constant growth model and relied on the documents forensic economics typically use to prepare economic damages reports.

As stated above, the Court does not doubt Zengler's reliance on the constant growth model and selected documents.  The Court finds Defendant's challenges go to the weight of the evidence, not its admissibility, and they can be addressed though cross examination and presentation of contrary evidence at trial.

### 7.  **Conclusion Regarding Defendant's Motions to Exclude**

Defendant's motions to exclude will be granted in part and denied in part as set forth above and in the order section below.  The Court will now address Defendant's motion for summary judgment.  Doc. No. 104-1.

## II.  **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant's motion seeks summary judgment on the following claims asserted by Plaintiffs: (1) failure to warn, (2) negligent design, (3) loss of consortium, and (4) punitive damages.[4]  The Court will review each claim in turn below.

### **SUMMARY JUDGMENT FRAMEWORK**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and

---

[4] Defendant's motion states that Defendant is also entitled to summary judgement on the ground that Plaintiff's expert testimony regarding causation by Margolis should be excluded.  Given that the Court did not exclude Margolis's testimony as discussed above, Defendant is not entitled to summary judgment on this ground.  Defendant's motion also seeks summary judgment on Plaintiffs' claims for negligent manufacturing (Count II) and breach of express warranty (Count III).  Plaintiffs state they "do not object to the dismissal of, the following Counts: Negligent Manufacturing (Count II), relating solely to a claim related to composition or construction, and Breach of Express Warranty (Count III)."  Doc. No. 114 at 8.  Therefore, the Court will dismiss these two claims.

that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>see</u> <u>Southern Cal. Darts Ass'n v. Zaffina</u>, 762 F.3d 921, 925 (9th Cir. 2014).  The moving party bears the burden of establishing the absence of a genuine issue of material fact, generally by "citing to particular parts of materials in the record" such as depositions, interrogatory answers, declarations, and documents.  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Cline v. Indus. Maint. Eng'g & Contracting Co.</u>, 200 F.3d 1223, 1229 (9th Cir. 2000) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)).  A fact is "material" if it might affect the outcome of the suit under the governing law. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986); <u>Thrifty Oil Co. v. Bank of</u> <u>Am. Nat'l Trust & Sav. Ass'n</u>, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248; <u>Long v. County of Los Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006).  If the moving party does not meet this burden, "[s]ummary judgment may be resisted and must be denied on no other grounds than that the movant has failed to meet its burden of demonstrating the absence of triable issues."  <u>Henry v. Gill Indus.</u>, 983 F.2d 943, 950 (9th Cir. 1993).

If the moving party meets this burden, the burden shifts to the opposing party to show a genuine issue of material fact.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies</u>, 210 F.3d 1099, 1103 (9th Cir. 2000).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but … must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 248; <u>Estate of Tucker v.</u> <u>Interscope Records</u>, 515 F.3d 1019, 1030 (9th Cir. 2008).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255; <u>Stegall v. Citadel</u> <u>Broad, Inc.</u>, 350 F.3d 1061, 1065 (9th Cir. 2003).  Summary judgment may not be granted "where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  <u>Fresno</u> <u>Motors, LLC v. Mercedes Benz USA</u>, LLC, 771 F.3d 1119, 1125 (9th Cir. 2015).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

factual predicate from which the inference may be drawn.  See Juell v. Forest Pharms., Inc., 456 F. Supp. 2d 1141, 1149 (E.D. Cal. 2006); UMG Recordings, Inc. v. Sinnott, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004).  If the nonmoving party does not produce enough evidence to create a genuine issue of material fact after the burden has shifted, the moving party is entitled to summary judgment.  Fed. R. Civ. P. 56(c); Nissan Fire & Marine Ins., 210 F.3d at 1103; Celotex, 477 U.S. at 322.

### 1. **Failure to Warn**

*Defendant's Arguments*

Defendant argues that Plaintiffs' failure-to-warn claims (Count I & II) fail as a matter of law because Ms. Zetz's implanting physician Dr. Dale would not have changed his decision to use the Obtryx with Ms. Zetz even if he had been warned of all alleged risks.  Accordingly, any such failure to warn could not have caused Ms. Zetz's injuries because warnings about them would not have changed Dale's decision to use the Obtryx in his treatment of Ms. Zetz.

*Plaintiffs' Arguments*

Plaintiffs argue that Defendant had a duty to warn about the risks of the Obtryx and that Defendant breached that duty by failing to provide adequate warnings of the risks and complications of that device.  Additionally, Plaintiffs contend that different warnings would have changed the course of Dale's conversation with Mrs. Zetz and the risk/benefit analysis he conducted.  Furthermore, Plaintiffs assert that had Ms. Zetz received warnings concerning the complications and injuries she experienced, she would not have consented to the implantation of the Obtryx.  According to Plaintiffs, this is sufficient to establish causation.

*Legal Standard*

California's learned intermediary doctrine holds that a manufacturer of prescription drugs or medical devices satisfies its duty to warn when it provides adequate warnings to the prescribing physician, as opposed to the patient.  See Carlin v. Superior Court, 13 Cal. 4th 1104, 1116 (1996) ("[I]n the case of prescription drugs, the duty to warn runs to the physician, not to the patient."); Brown v. Superior Court, 44 Cal. 3d 1049, 1061 n.9 (1988) ("It is well established that a manufacturer fulfills its duty to warn if it provides adequate warning to the physician.").  The

rationale for the learned intermediary doctrine is as follows:

> (1) The doctor is intended to be an intervening party in the full sense of the word. Medical ethics as well as medical practice dictate independent judgment, unaffected by the manufacturer's control, on the part of the doctor.  (2) Were the patient to be given the complete and highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug, thereby jeopardizing his life.  (3) It would be virtually impossible for a manufacturer to comply with the duty of direct warning, as there is no sure way to reach the patient.

Carmichael v. Reitz, 17 Cal. App. 3d 958, 989 (1971).

The learned intermediary doctrine applies to implanted medical devices, Bigler-Engler v. Breg, Inc., 7 Cal. App. 5th 276, 320 (2017), and it covers failure to warn claims under both the strict liability theory and the negligence theory.  Saavedra v. Eli Lily & Co., 2013 U.S. Dist. LEXIS 173055, 2013 WL 6345442, *3 (C.D. Cal. Feb. 26, 2013); see also Huntman v. Danek Med. Inc., 1998 U.S. Dist. LEXIS 13431, 1998 WL 663362, at *1, *5-6 (S.D. Cal. July 24, 1998) (concluding that learned intermediary doctrine applied to both strict liability and negligence, as well as fraud and warranty claims); cf. Lord v. Sigueiros, 2006 WL 1510408, at *1 (Cal. Sup. Ct. Apr. 25, 2006) (finding that negligence, strict liability, and other warnings-based claims all alleged a failure to warn).

Under the learned intermediary doctrine, a plaintiff must prove "not only that no warning was provided or that the warning was inadequate, but also that the inadequacy or absence of the warning caused the [plaintiff's] injury." Motus v. Pfizer Inc., 196 F. Supp. 2d 984, 991 (C.D. Cal. 2001), aff'd sub nom. Motus v. Pfizer Inc. (Roerig Div.), 358 F.3d 659 (9th Cir. 2004); see also Latiolais v. Merck & Co., Inc., 302 F. App'x 756, 757 (9th Cir. 2008).  Consequently, "[a] product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician."  Motus, 358 F.3d at 661; see also Tucker v. Wright Med. Tech., Inc., 2013 U.S. Dist. LEXIS 38354, 2013 WL 1149717, at *16 (N.D. Cal. Mar. 19, 2013) ("[I]nadequacy of the warning and causation are separate elements of Plaintiffs' affirmative burden. Where the physician did not read the warnings, adequacy is irrelevant and it follows that the inclusion of adequate warnings in that information would not have affected his decision." (citations and internal quotation marks omitted)).

1    *Discussion*

2         The record indicates that Dale was asked during his deposition about whether Defendant

3    had warned him about a number of alleged risks of the Obtryx device, including pudendal

4    neuralgia, spastic pelvic floor syndrome, and chronic debilitating pelvic pain; about the

5    permanency, frequency, or severity of complications; and about other alleged facts regarding the

6    Obtryx and its polypropylene material that Plaintiffs consider unfavorable.  Doc. No. 104-10 at

7    91-95, 99-101.  When asked whether knowledge of all these risks in 2008 would have affected his

8    decision to use the Obtryx with Ms. Zetz at that time, Dale answered "No."  Id. at 106 ("Q. Had

9    you known about those risks in 2008, and you now stated that you would have warned Mrs. Zetz

10   about those risks, would that have affected your decision to use the Obtryx sling at that time? A.

11   No.").  When asked again why knowledge of these risks would not have changed his treatment

12   decision, Dale answered that the procedure of treating SUI with the Obtryx was the best for the

13   patient, and there was no level of credible risk that would have changed that opinion.  Id. at 117

14   ("A. Far and away this procedure was more risk free or trouble free than any I have ever done for

15   this diagnosis. And I can't think of anything you said that would make me change it. Q. All right.

16   So there is no level of risk that would have outweighed the benefits in your mind? A. Not that I'm

17   aware of.").  Notwithstanding Plaintiffs' argument that knowledge of all the alleged risks in 2008

18   would have affected Dale's risk/benefit analysis, Dale testified that no level of additional risk

19   would have outweighed the benefits of the procedure in his mind.  Id.

20        In light of this testimony, the Court finds that a reasonable jury could not conclude that

21   additional information from Defendant regarding risks associated with the Obtryx device would

22   have affected the course of treatment Dale prescribed and implemented for Ms. Zetz's stress

23   urinary incontinence, even assuming Dale was not fully apprised of such risks in 2008.  Plaintiffs

24   do not present any meaningful argument that Dale's testimony was equivocal or uncertain, or any

25   evidence placing his credibility into question.  Plaintiffs instead argue that Defendant's failure to

26   warn caused her injuries because had Ms. Zetz received warnings concerning all the risks and

27   complications of the Obtryx, she would not have consented to the implantation.  However, this

28   alleged standard of establishing causation is not the standard courts, including this Court, have

applied in similar failure-to-warn cases in accordance with California law.  See Enborg, 2022 U.S. Dist. LEXIS 47313, at *60-61; Brennan v. Johnson, 2022 U.S. Dist. LEXIS 214585, *34 (C.D. Cal. Nov. 18, 2022); see also Motus, 358 F.3d at 661; Tucker, 2013 U.S. Dist. LEXIS 38354, at *51.  Therefore, Plaintiffs cannot show causation under California's learned intermediary doctrine, and Defendant is entitled to summary judgment on Counts I and II to the extent they are based on Defendant's alleged failure to furnish accurate and adequate information regarding the Obtryx. Motus, 358 F.3d at 661.

## 2.  **Negligent Design**

### *Defendant's Arguments*

Defendant argues that summary judgment on Plaintiff's negligent design claim (Count II) is warranted because Plaintiffs cannot establish either that Defendant breached an applicable duty of care in designing the Obtryx or that any such breach caused any of Ms. Zetz's injuries. Additionally, Defendant asserts that any standard of care for negligence must be established through expert testimony, and Plaintiffs' experts have failed to establish any standard of care that applied to Defendant, that any such standard was breached, or that any such breach caused Plaintiffs' damages.

### *Plaintiffs' Arguments*

Plaintiffs assert that to establish their negligent design claim, they are not required to establish a standard of care through an expert witness under California law, nor that Defendant breached an industry standard.  Rather, Plaintiffs argue they can establish their negligent design claim by providing evidence that the risks of the Obtryx outweighed its benefits and that the Obtryx was defective.  Plaintiffs contend they provided such evidence primarily through their experts' testimony.

### *Legal Standard*

A plaintiff alleging a design defect claim under a negligence theory must prove "that the defect in the product was due to negligence of the defendant."  Chavez v. Glock, Inc., 207 Cal. App. 4th 1283, 1305 (2012) (quoting Merrill v. Navegar, Inc., 26 Cal. 4th 465, 479 (2001)); Kamlade v. Leo Pharma Inc., 2022 U.S. Dist. LEXIS 21963, *12 (E.D. Cal. Feb. 6, 2022).  As

with a general negligence claim, the plaintiff must "show breach of duty, causation, and damages." Howard v. Omni Hotels Mgmt. Corp., 203 Cal. App. 4th 403, 428 (2012) (citing Artiglio v. Corning Inc., 18 Cal. 4th 604, 614 (1998)); Kamlade, 2022 U.S. Dist. LEXIS 21963, at *12.  As to the standard of care for negligence, a "[designer/manufacturer] is negligent if [it] fails to use the amount of care in [designing] the product that a reasonably careful [designer/manufacturer] would use in similar circumstances to avoid exposing others to a foreseeable risk of harm."  Howard, 203 Cal. App. 4th at 428; Kamlade, 2022 U.S. Dist. LEXIS 21963, at *12-*13.  "In determining whether [defendant] used reasonable care, [the jury] should balance what [defendant] knew or should have known about the likelihood and severity of potential harm from the product against the burden of taking safety measures to reduce or avoid the harm."  Howard, 203 Cal. App. 4th at 428; Tucker, 2013 U.S. Dist. LEXIS 38354, at *23.

Generally, the "test of negligent design involves a balancing of the likelihood of harm to be expected from a product with a given design and the gravity of harm if it happens[,] against the burden of the precaution which would be effective to avoid the harm."  Merrill, 26 Cal. 4th at 479; Rodman v. Otsuka Am. Pharm., Inc., 564 F. Supp. 3d 879, 894 (N.D. Cal. 2020); Oregon v. Bos. Sci. Corp., 2022 U.S. Dist. LEXIS 90990, *18 (E.D. Cal. May 20, 2022).  "Even if a manufacturer has done all it reasonably could have done to warn about a risk or hazard related to a product's design, a reasonable person could conclude that the magnitude of the reasonably foreseeable harm as designed outweighed the utility of the product as designed."  Chavez, 207 Cal. App. 4th at 1305; Rodman, 564 F. Supp. 3d at 894.  "This analysis is akin to a risk-benefit test."  Kamlade, 2022 U.S. Dist. LEXIS 21963, at *13 (citing Tucker, 2013 U.S. Dist. LEXIS 38354, at *24); Oregon, 2022 U.S. Dist. LEXIS 90990, at *18.  "In evaluating the adequacy of a product's design under the risk-benefit test, 'a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.'"  Rodman, 564 F. Supp. 3d at 894 (citing Tucker, 2013 U.S. Dist. LEXIS 38354, at *24-*25).  Furthermore, "[a] product liability case must be based on substantial evidence establishing

both the defect and causation (a substantial probability that the design defect, and not something else, caused the plaintiff's injury)." Enborg, 2022 U.S. Dist. LEXIS 47313, at *61; Stephen v. Ford Motor Co., 134 Cal. App. 4th 1363, 1373 (2005).

>    *Discussion*

As an initial matter, the Court notes that based on the parties' briefing and the Court's own research, it is unclear whether a plaintiff in a negligent design case must establish the "duty" element by having an expert opine on the "industry standard of care" applicable to the defendant. As mentioned above, a designer/manufacturer upholds its standard of care by "us[ing] the amount of care in [designing] the product that a reasonably careful [designer/manufacturer] would use in similar circumstances to avoid exposing others to a foreseeable risk of harm." Howard, 203 Cal. App. 4th at 428; Kamlade, 2022 U.S. Dist. LEXIS 21963, at *12-*13. The Court is unaware of any law mandating that this standard can only be ascertained through expert testimony on the applicable "industry standard of care."[5] At any rate, neither party argues that Plaintiffs are required to prove that Defendant breached an "industry standard." See Doc. No. 112 at 14 ("Boston Scientific never argued that Plaintiffs had to show that it had breached an industry standard"); Doc. No. 114 at 21 ("Plaintiffs are not required to establish that BSC breached an industry standard in order to establish their negligence claim."). Additionally, "while an industry custom is relevant to questions of due care, it is not dispositive under California law." C & C Props. v. Shell Pipeline Co., 2019 U.S. Dist. LEXIS 206439, *29-30 (E.D. Cal. Nov. 27, 2019) (citing Howard, 203 Cal. App. 4th at 421 ("In negligence and due care determinations, a manufacturer's compliance with regulations, directives or trade custom does not necessarily eliminate negligence but instead simply constitutes evidence for jury consideration with other facts and circumstances.")). With these insights in mind, the Court will evaluate whether Defendant used reasonable care under the risk-benefit test by balancing "what [Defendant] knew or should have known about the likelihood and severity of potential harm from the [Obtryx] against the

---

[5] Defendant cites *Howard* for the proposition that "because Plaintiffs' design claims address the design and manufacture of a sophisticated medical device and necessarily involve expert balancing of safety and efficacy concerns, any standard of care for negligence must be established through expert testimony." Doc. No. 112 at 14 (citing Howard, 203 Cal. App. 4th at 430). However, Defendant acknowledges that it has "never argued that Plaintiffs had to show that it had breached an industry standard." Id.

burden of taking safety measures to reduce or avoid the harm."  Howard, 203 Cal. App. 4th at 428; Tucker, 2013 U.S. Dist. LEXIS 38354, at *23.  The Court will also evaluate whether any failure by Defendant to use reasonable care caused Plaintiffs' alleged injuries.

With respect to the likelihood and severity of potential harm from the Obtryx, Plaintiffs' expert Pence testified that "synthetic materials such as polypropylene are known to induce an acute inflammatory response, followed by chronic inflammatory response and foreign body reaction. A chronic inflammatory response and heightened foreign body reaction have the potential to result in failure of the device to perform safely and effectively, with significant adverse consequences for the patient."  Doc. No. 114 at 22; Doc. No. 100-3 at 51-52.  Similarly, Plaintiff's expert Mays testified that polypropylene is susceptible to oxidation and degrades by an oxidative mechanism in the body.  Doc. No. 99-3 at 6; Doc. No. 99-4 at 11.  Although it is unclear whether Defendant knew about all the alleged risks of polypropylene, Pence and Mays testified that prior to the initial marketing of the Obtryx, the existing literature at the time provided strong evidence that the serious risks of the mesh were knowable or should have been known to Defendant.  Doc. No. 100-3 at 52; Doc. No. 99-3 at 27.  Pence also testified that Defendant used a polypropylene that had not been qualified by the supplier for permanent human implantation and used it for a medical application that was disallowed according to the MSDS.  Doc. No. 114 at 22; Doc. No. 100-3 at 51.

Furthermore, with respect to the availability of safety measures to reduce or avoid harm, Pence testified that in light of the risks of polypropylene and based on her review of NICE, HAS, and GHTF standards, Defendant should have performed adequate preclinical and clinical testing of the Obtryx Sling prior to marketing to ensure the devices were reasonably safe for permanent implantation.  Doc. No. 100-3 at 18; Doc. No. 100-3 at 52.  Additionally, Pence testified that although Defendant recognized the benefits of lighter-weight mesh, specifically, that reduced mesh density is associated with reduced tissue response, scarring and shrinkage, Defendant delayed transitioning to a lightweight mesh for roughly three years.  Doc. No. 100-3 at 51.  Mays also testified that polyethylene and PVDF were safer alternatives to polypropylene for mesh products.  Doc. No. 99-4 at 2, 11.  As stated above, the Court found the above testimony by Pence

and Mays admissible while reviewing Defendant's motions to exclude their testimony.

With respect to causation, Margolis testified that the Obtryx sling "caused or significantly contributed to Ms. Zetz's documented injuries which include: (1) vulvodynia, (2) vaginal pain, (3) groin pain, (4) interstitial cystitis, (5) dyspareunia, (6) pelvic floor myalgia (7) spastic pelvic floor syndrome, (8) right and left pudendal neuralgia, (9) right and left obturator neuralgia, (10) recurrent urinary tract infections, and (11) scarring, retraction and contraction of vagina, urethra, periurethral tissue obturator internus and obturator membrane.  Doc. No. 98-3 at 12.  The Court previously found in deciding Defendant's motion to exclude Margolis's testimony that a reasonable jury could find such a causal connection.

In light of the above testimony and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that there are triable issues of fact regarding the risks and benefits of the Obtryx, Defendant's knowledge of the risks, the likelihood and foreseeability of harm, the magnitude of foreseeable harms, available safety measures, and—as with any negligence claim—whether Defendant's conduct was reasonable.  Tucker, 2013 U.S. Dist. LEXIS 38354, at *34; Renteria v. Ethicon, Inc., 2020 U.S. Dist. LEXIS 242116, *21-22 (C.D. Cal. Nov. 18, 2020).  Therefore, the Court will deny Defendant's motion for summary judgment with respect to Plaintiff's negligent design claim.

### 3. Loss of Consortium

*Parties' Arguments*

The parties agree that Mr. Zetz's claim for loss of consortium is derivative and falls or survives based on the success of Plaintiff's other claims.  Doc. No. 122 at 6 n.1.

*Discussion*

The Court has found that Defendant is entitled to summary judgment on Plaintiffs' failure to warn claims, but that Defendant is not entitled to summary judgment on Plaintiffs' negligent design claim.  Therefore, the Court will grant Defendant's motion for summary judgment to the extent Mr. Zetz's loss of consortium claim is predicated on Ms. Zetz's failure to warn claims but will deny the motion to the extent Mr. Zetz's loss of consortium claim is predicated on Ms. Zetz's surviving negligent design defect claim.  Vanhooser v. Superior Court, 206 Cal. App. 4th 921, 927

(2012) ("A cause of action for loss of consortium is, by its nature, dependent on the existence of a cause of action for tortious injury to a spouse."); <u>Dominguez v. Excel Mfg. Co.</u>, 2010 U.S. Dist. LEXIS 118789, *43 (N.D. Cal. Nov. 8, 2010) (where negligence claim in products liability case survives summary judgment, so does the loss of consortium claim)).

### 4. **Punitive Damages**

*Defendant's Arguments*

Defendant argues that Plaintiffs are not entitled to punitive damages because Massachusetts law governs Plaintiffs' claim for punitive damages and Massachusetts law bars such damages in this case. Defendant also contends that punitive damages are not warranted even if California law applies because Defendant's conduct was not malicious, reckless, or consciously disregardful of the rights of others.

*Plaintiffs' Arguments*

Plaintiffs argue that California law governs and, therefore, Massachusetts law does not bar their request for punitive damages in this case. Additionally, Plaintiffs assert that under California law, they are entitled to punitive damages because Defendant, through its employees, engaged in wanton, willful, or reckless conduct in blatant disregard of Plaintiff's safety and health when it marketed and sold the Obtryx.

*Legal Standards*

A. <u>Choice of Law</u>

In diversity cases, "federal courts must apply the choice-of-law rules of the forum state." <u>Rustico v. Intuitive Surgical, Inc.</u>, 993 F.3d 1085, 1091 (9th Cir. 2021). In California, courts have "adopted and consistently applied the so-called 'governmental interest' analysis as the appropriate general methodology for resolving choice-of-law questions." <u>Id.</u> (citing <u>McCann v. Foster Wheeler LLC</u>, 48 Cal. 4th 68 (Cal. 2010)). This approach generally involves three steps: first, the court must determine whether the substantive laws of California and the foreign jurisdiction differ on the issue before it. <u>Id.</u> (citing <u>Cooper v. Tokyo Elec. Power Co. Holdings</u>, 960 F.3d 549, 559 (9th Cir. 2020)). Second, if the laws do differ, then the court must determine what interest, if any, the competing jurisdictions have in the application of their respective laws. <u>Id.</u> If only one

1 jurisdiction has a legitimate interest in the application of its rule of decision, there is a "false

2 conflict," and the law of the interested jurisdiction is applied.  Id.  But if more than one

3 jurisdiction has a legitimate interest, the court must move to the third stage of the analysis, which

4 focuses on the comparative impairment of the interested jurisdictions.  Id.  This third step requires

5 the court to identify and apply the law of the state whose interest would be the more impaired if its

6 law were not applied.  Id.

7     B.  Massachusetts and California Law

8     In Massachusetts, punitive damages are not allowed unless expressly authorized by statute.

9 Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 412 (2013).  The purposes of punitive damages

10 include "condemnation and deterrence," and a "proper punitive damage award" is one that is

11 "sufficient . . . to send a clear message to the [defendant] of condemnation for its reprehensible

12 behavior."  Id. (internal citations omitted).  Under California law, punitive damages require a

13 showing by clear and convincing evidence that a defendant acted with oppression, fraud, or

14 malice. Cal. Civ. Code § 3294(a).  "Punitive damages may be awarded in a product liability

15 action if it is shown that the defendant placed a product on the market in conscious disregard of

16 the safety of consumers and others."  Ehrhardt v. Brunswick, Inc., 186 Cal. App. 3d 734, 741

17 (1986); Brennan, 2022 U.S. Dist. LEXIS 214585, at *44.  "Conscious disregard" means that the

18 defendant "was aware of the probable dangerous consequences of his conduct, and that he

19 willfully and deliberately failed to avoid those consequences."  Butte Fire Cases, 24 Cal. App. 5th

20 1150, 1159 (2018); Brennan, 2022 U.S. Dist. LEXIS 214585, at *44.  Put another way, the

21 defendant must "have actual knowledge of the risk of harm it is creating and, in the face of that

22 knowledge, fail to take steps it knows will reduce or eliminate the risk of harm."  King v. U.S.

23 Bank Nat'l Ass'n, 53 Cal. App. 5th 675, 711 (2020); Hardeman v. Monsanto Co., 997 F.3d 941,

24 971 (9th Cir. 2021).  When the defendant is a corporate entity, the advance knowledge and

25 conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on

26 the part of an officer, director, or managing agent of the corporation. Cal. Civ. Code § 3294(b).

27     Discussion

28     As Plaintiffs note, other courts in similar cases involving Defendant applied California's

choice-of-law rules to determine whether the punitive damages law of California or Massachusetts governed in their cases.  See Sanchez v. Bos. Sci. Corp., 38 F. Supp. 3d 727, 737-41 (S.D. W. Va. 2014).  The *Sanchez* court thoroughly analyzed and applied all three steps of California's governmental interest test and concluded that California's punitive damages law applied.  The Court agrees with and incorporates the analysis in *Sanchez*, and rules that California's punitive damages law governs in this case.  Id.  Defendant does not attempt to distinguish *Sanchez*, and instead relies on Salinero v. Johnson & Johnson, 400 F. Supp. 3d 1334 (S.D. Fla. 2019) to support their position that Massachusetts law applies.  However, *Salinero* is distinguishable because it applied choice-of-law analysis under Florida law and determined that New Jersey's punitive damages law applied.  Salinero v. Johnson & Johnson, 408 F. Supp. 3d 1354, 1356-58 (S.D. Fla. 2019).  Therefore, in accordance with *Sanchez*, the Court holds that California's punitive damages law governs in this case.

Under California's punitive damages law, the Court finds that there are triable issues of fact regarding the risks of the Obtryx, Defendant's knowledge of the risks, and Defendant's knowledge of any measures it could have taken to reduce or eliminate any risks.  Defendant contends that it used reasonable care in designing the Obtryx because it followed industry standards.  However, compliance with industry standards is not necessarily proof of reasonable conduct.  Howard, 203 Cal. App. 4th at 420-21.  The record indicates that the polypropylene resin Defendant used to manufacture the Obtryx contained a MSDS instructing "[d]o not use this [] material in medical applications involving permanent implantation in the human body or permanent contact with internal body fluids or tissues."  PUMF ¶¶ 1-2; Doc. No. 115-4 at 2.  Pence and Mays further testified that prior to the initial marketing of the Obtryx sling, the existing literature at the time provided evidence that the potential for serous complications associated with the use of the mesh was knowable to Defendant.  Doc. No. 100-3 at 52; Doc. No. 99-3 at 27.  Additionally, Pence testified that Defendant did not perform adequate preclinical and clinical testing of the Obtryx Sling prior to marketing, Doc. No. 100-3 at 18, 52, and that although Defendant recognized the safety benefits of lighter-weight mesh, Defendant delayed transitioning to a lightweight mesh for roughly three years.  Doc. No. 100-3 at 51.  Mays also testified that safer

alternatives, including at least polyethylene and PVDF, were available at the time Defendant's mesh products were introduced into the market.  Doc. No. 99-4 at 12.

In light of the above testimony and drawing all reasonable inferences in favor of Plaintiffs, the Court finds a reasonable jury could conclude that Defendant, through one of its officers, directors, or managing agents,[6] had knowledge of the risk of harm it created and despite that knowledge, failed to take steps it knew would reduce or eliminate the risk of harm.  King, 53 Cal. App. 5th at 711; Hardeman, 997 F.3d at 971.  Therefore, the Court will deny Defendant's motion for summary judgment regarding Plaintiffs' claim for punitive damages.

## III.   ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendant's motion to exclude opinions of Margolis (Doc. No. 98) is granted in part and denied in part as follows:

   a.  The motion is granted as to Margolis's opinions regarding the adequacy of the Obtryx DFU, marketing, the chemical properties of polypropylene mesh, that the Burch procedure and other SUI surgical procedures are more effective than polypropylene slings, that Xenform slings are more effective than polypropylene slings, and that the infection rate of polypropylene mesh is 100%.

   b.  The motion is granted as to Margolis's opinions on Defendant's state of mind, knowledge, and intent, but is denied to the extent that Margolis may testify about his review of Defendant's corporate documents solely for the purpose of explaining the basis for his otherwise admissible opinions.

   c.  The motion is denied as to Margolis's opinions regarding the causal relationship between the Obtryx and Ms. Zetz's pudendal neuralgia.

   d.  The motion is denied as to Margolis's opinions regarding (1) biomaterials, (2) polypropylene degradation, (3) chronic foreign body reaction, (4) adequate pore

---

[6] While Defendant argues that Plaintiffs do not identify any officer, director, or managing agent who acted on behalf of Defendant, the record and testimony indicate the names of several BSC individuals.  See Doc. Nos. 114 at 11 (Charles Smith) and 100-3 at 27-55 (Evan Brasington, Janice Connor, Janet McGrath, Michelle Berry, Donna Gardner).

size for polypropylene mesh, (5) adequate weight of polypropylene, (6)
biocompatibility of polypropylene, and (7) medical device design and development,
to the extent his opinions concern the mesh's reaction to and effect on the human
body.

    e.   The Court reserves ruling on testimony regarding Margolis's opinions on Plaintiff's
future medical treatment needs.

2.  Defendant's motion to exclude opinions of Mays (Doc. No. 99) is granted in part and
denied in part as follows:

    a.   The motion is granted as to Mays's opinions on medical complications caused by
polypropylene degradation, but is denied to the extent that Mays may testify
generally that polypropylene is susceptible to oxidation and degrades.

    b.   The motion is granted as to Mays's opinions that are based on his TGA or *Imel*
article, but is denied to the extent that Mays may testify generally that
polypropylene is susceptible to oxidation and degrades.

    c.   The motion is denied as to Mays's opinions concerning whether polyethylene and
PVDF are safer alternatives to polypropylene for mesh products.

    d.   The motion is granted as to Mays's opinions on Defendant's state of mind,
knowledge, and intent, but is denied to the extent that Mays may testify about his
review of Defendant's corporate documents solely for the purpose of explaining the
basis for his otherwise admissible opinions.

    e.   The motion is denied as to Mays's opinions that he does not believe the Obtryx is
suitable to serve as a permanent implant, but his opinions cannot be phrased as
legal conclusions.

3.  Defendant's motion to exclude opinions of Pence (Doc. No. 100) is granted in part and
denied in part as follows:

    a.   The motion is granted as to Pence's opinion that Defendant should have included
information in its labels on the difficulty of mesh removal and the permanency,
severity, and frequency of adverse events.  However, the motion is denied as to

Pence's remaining opinions on product labeling.

    b.   The motion is granted as to Pence's opinions regarding the adequacy of Defendant's post-market vigilance and the carcinogenicity of polypropylene mesh.

    c.   The motion is granted as to Pence's opinions regarding the section 510(k) process, including subsequent enforcement actions and discussion of the information Defendant did or did not submit in its section 510(k) application.

    d.   The motion is granted as to Pence's opinions on Defendant's state of mind, knowledge, and intent, but is denied to the extent that Pence may testify about her review of Defendant's corporate documents solely for the purpose of explaining the basis for her otherwise admissible opinions.

    e.   The motion is denied as to Pence's opinions regarding the adequacy of Defendant's premarket clinical testing for the mesh product.

4.   Defendant's motion to exclude opinions of Tremp (Doc. No. 101) is granted in part and denied in part as follows:

    a.   The motion is granted as to Tremp's opinions that Ms. Zetz will require psychological evaluations, individual counseling, and neurological treatment.

    b.   The motion is denied as to Tremp's opinions that Ms. Zetz will require a home health aide, wheelchair, walker, shower chair, power scooter, power lift recliner, bed rail, and grab bars on a raised toilet seat.

    c.   The Court will reserve ruling on testimony that Ms. Zetz will require urological treatment and medical needs concerning physical therapy, pelvic floor physical therapy, valium, gynecological surgeon treatment, ketamine, and bilateral pudendal nerve treatment.

5.   Defendant's motion to exclude opinions of Zengler (Doc. No. 102) is granted in part and denied in part as follows:

    a.   The motion is granted to the extent Zengler's opinions rest on Tremp's recommendations for future psychological evaluations, individual counseling, and neurological treatment.

      b.  The Court will reserve ruling on testimony that is based on Tremp's recommendations for future urological care and medical needs concerning physical therapy, pelvic floor physical therapy, valium, gynecological surgeon treatment, ketamine, and bilateral pudendal nerve treatment.

6.  Defendant's motion to exclude opinions of Shih (Doc. No. 103) is granted in part and denied in part as follows:

      a.  The motion is granted as to Shih's opinions regarding the cause of Ms. Zetz's clinical complications, including any opinion correlating his pathologic findings with her alleged clinical symptoms.

      b.  The motion is denied as to Shih's opinions regarding the presence of fibrosis, chronic inflammation, and foreign body reaction that he observed during his examination of Ms. Zetz's tissue samples.

7.  Defendant's motion for summary judgment (Doc. No. 104) is granted in part and denied in part as follows:

      a.  The motion is denied as to Plaintiffs' negligent design claim, corresponding punitive damages claim, and loss of consortium claim to the extent the loss of consortium claim is based on the negligent design claim.

      b.  The motion is granted as to Plaintiffs' failure-to-warn claims, negligent manufacturing claim, breach of express warranty claim, loss of consortium claim to the extent this claim is not based on the negligent design claim, and punitive damages claims to the extent these claims are not based on the negligent design claim.

IT IS SO ORDERED.

Dated:  __December 5, 2022__      _____

                         SENIOR  DISTRICT  JUDGE